**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------------ x
In re:                                                       :   Chapter 11
                                                             :
BMI OLDCO INC., et al.,¹                                     :   Case No. 23-90794 (MI)
                                                             :
                    Debtors.                                 :   (Jointly Administered)
                                                             :
------------------------------------------------------------ x
                                                             :
                                                             :
BMI OLDCO INC. and BARRETTS                                  :
VENTURES TEXAS LLC,                                          :
                                                             :   Adv. Pro. No. _____
                                                             :
                    Plaintiffs,                              :
                                                             :
v.                                                           :
                                                             :
                                                             :
THOSE PARTIES LISTED IN APPENDIX A TO                        :
COMPLAINT and JOHN AND JANE DOES 1-                          :
1,000,²                                                      :
                                                             :
                    Defendants.                              :
                                                             :
------------------------------------------------------------ x
```

**DEBTORS' ADVERSARY COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF REGARDING
ESTATE-OWNED TESTING CLAIMS**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in

these chapter 11 cases (these "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary

proceeding (this "**Adversary Proceeding**") bring this complaint (the "**Complaint**") pursuant to

Rules 7001(7), 7001(9), and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
      BMI Oldco Inc. (f/k/a Barretts Minerals Inc.) ("**BMI**") (8715) and Barretts Ventures Texas LLC ("**BVT**") (0787).
      The Debtors' address is 5605 North MacArthur Boulevard, Suite 1000, PMB 139, Irving, Texas 75038.

[2]   A complete list of the Defendants, each of whom is a plaintiff in the Testing Actions (as defined below), is set
      forth in Appendix A to this Complaint.

**Rules**") and sections 105(a) and 362(a) of title 11 of the United States Code (the "**Bankruptcy Code**") seeking declaratory and injunctive relief.  Specifically, the Debtors seek (i) a declaration pursuant to 28 U.S.C. § 2201(a) that any claims against Minerals Technologies Inc. ("**MTI**"), Specialty Minerals Inc. ("**SMI**"), and/or any other non-debtor subsidiaries of MTI (together with MTI and SMI, the "**BMI Affiliates**") premised on any alleged inadequacies in testing talc mined, beneficiated, and/or sold by BMI ("**Testing Claims**," and such claimant, "**Testing Claimants**"), including the Testing Claims asserted in the actions identified in Appendix A to the Complaint (the "**Testing Actions**"), are property of BMI's estate, (ii) a declaration that the continued prosecution of or filing of additional Testing Claims violates the automatic stay pursuant to section 362(a)(3) of the Bankruptcy Code, and (iii) an order enjoining the prosecution of or filing of any additional Testing Claims pursuant to section 105(a) of the Bankruptcy Code during the pendency of these Chapter 11 Cases, and state as follows:

## INTRODUCTION

1.  The Debtors commenced these Chapter 11 Cases to fully and fairly resolve BMI's talc-related liabilities, including hundreds of personal injury claims seeking damages on account of exposure to talc allegedly contaminated with asbestos that was mined, beneficiated, processed, and/or sold by BMI (the "**Talc Claims**," and such claimants, "**Talc Claimants**").   At all times since the filing of these Chapter 11 Cases on October 2, 2023, Talc Claims naming the Debtors have been stayed pursuant to section 362 of the Bankruptcy Code.  On December 8, 2023, this Court ruled that the automatic stay bars Talc Claims asserted against MTI and SMI *except* to the extent such Talc Claimants' only asserted claim is a Testing Claim.[3]  And this Court expressly

---

[3]   The stay as to the BMI Affiliates is pursuant to this Court's oral ruling in an adversary proceeding filed by the Debtors and memorialized in this Court's *Order (I) Declaring that the Automatic Stay Prohibits Certain Actions or, in the Alternative, (II) Preliminary Enjoining Such Actions Pursuant to 11 U.S.C. § 105* (the "**PI Order**").

invited the Debtors to revisit whether it was appropriate to stay Testing Claims "at any time . . . if the facts change." *In re Barretts Minerals, Inc., et al. v. Those Parties Listed in Appendix A to the Complaint*, Adv. Pro. 23-03225 (MI), December 8, 2023 Hr'g Tr. at 140:9-13. As discussed below, the facts have changed. Through this adversary proceeding, the Debtors now seek definitively to establish that Testing Claims are property of BMI's estate, such that they may be prosecuted or settled to maximize recovery for all of the Debtors' creditors and Testing Claimants are prohibited from pursuing such claims for themselves individually.

2. Over the past 15 months, the Debtors have engaged in mediation with the BMI Affiliates, the Official Committee of Unsecured Creditors (the "**Committee**"), and the legal representative for future talc personal injury claimants (the "**FCR**") regarding a potential resolution of the BMI's talc liabilities, all the while claimants have continued to file Testing Actions against MTI and SMI (many of which do not limit the asserted claims to Testing Claims). The recent stalling of progress in the mediation leaves the Debtors with no choice but to seek the Court's determination on legal issues that they expect will be critical to the Debtors' efforts to address BMI's talc-related liabilities through these Chapter 11 Cases – namely, whether Testing Claims, including any asserted in the currently-pending Testing Actions, are property of BMI's estate.[4] It has become clear that a ruling from this Court as to who owns Testing Claims—a key estate asset—is a gating item both to potential further negotiations with BMI Affiliates, the Committee, and/or the FCR, but also to what consideration may be available for all creditors in the cases (including future claimants), through the Debtors' forthcoming plan.

---

*See Barretts Minerals Inc., et al. v. Those Parties Listed in Appendix A to Complaint, et al.*, Adv. Pro. No. 23-03225 (MI), Docket No. 92.

[4] Testing Claims encompass Testing Actions, as each Testing Action purports to assert a Testing Claim. Unless otherwise indicated, any reference to Testing Claims in this Complaint includes the Testing Actions. For purposes of this Complaint, the inclusion of a claim in Appendix A is not an admission that such Defendant has asserted only a Testing Claim such that it fits within the exception of the PI Order.

3. Through Testing Claims, Testing Claimants seek to (i) establish that BMI's talc was contaminated with asbestos and caused their mesothelioma, and (ii) recover damages from the BMI Affiliates for such claimants' exposure to BMI's allegedly asbestos-contaminated talc, which they claim was caused, in whole or in part, by the BMI Affiliates' inadequate testing of talc mined, beneficiated, and/or sold by BMI. Such claims, however, are property of BMI's estate because the Testing Claimants' injuries are entirely derivative of any injury to BMI caused by the BMI Affiliates. Indeed, as set forth in the complaints filed by Testing Claimants, it is the inadequacy of such testing that caused BMI to release or sell the allegedly asbestos-containing talc to which the Testing Claimants were exposed. Put differently, any harm flowing from the BMI Affiliates' testing (or alleged failure to test appropriately) harmed BMI (*i.e.*, causing BMI to release allegedly asbestos-containing talc into the market), and any injury suffered by Testing Claimants flows from exposure to that BMI-sold talc and gives rise to damages that could be asserted by BMI against the BMI Affiliates. Because such Testing Claims, as a matter of law, are claims belonging exclusively to the Debtors, the Debtors seek an order declaring that Testing Claims are property of BMI's estate under section 541 of the Bankruptcy Code.

4. In addition, because Testing Claims are property of BMI's estate, the Debtors seek an order declaring that that the automatic stay applies to and prohibits the continued prosecution or filing of any Testing Claims (including the Testing Actions) pursuant to section 362(a)(3) of the Bankruptcy Code and therefore, any continued prosecution or filing of Testing Claims would constitute an act to obtain possession of or exercise control over property of BMI's estate. Alternatively, the automatic stay should be extended to such claims pursuant to section 105 of the

Bankruptcy Code because Testing Claims necessarily are premised on a finding of BMI's liability.[5]

<strong><u>JURISDICTION AND VENUE</u></strong>

5.       This Adversary Proceeding arises in and relates to the Debtors' cases pending before this Court under chapter 11 of the Bankruptcy Code.

6.       The Court has jurisdiction to consider this Adversary Proceeding pursuant to 28 U.S.C. § 1334.

7.       The Court has subject matter jurisdiction over the Testing Claims pursuant to 28 U.S.C. § 1334.   Arising under and arising in jurisdiction exist over this action because this Complaint seeks to determine what constitutes property of BMI's estate, interpret the scope of the automatic stay, and extend the automatic stay to Testing Claims against BMI Affiliates.  Related-to jurisdiction exists over claims against non-debtor BMI Affiliates because (i) the Debtors would face the risk of being bound or prejudiced by multiple determinations of factual and legal issues if the Testing Claims as against the BMI Affiliates are not stayed, and (ii) continued prosecution of the Testing Claims would divert critical estate resources from the Debtors' reorganization efforts.

8.       This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors consent to the entry of

---

[5]     Contemporaneous with the filing of this Complaint, the Debtors are also filing  (i) the *Motion for an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors* (the "**PI Motion**"); (ii) the *Debtors' Motion for Summary Judgment with respect to Counts I and II of the Complaint* (the "**Motion for Summary Judgment**"); and (iii) *Declaration of David J. Gordon in Support of the Debtors' Motions for (A) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors, and (B) Summary Judgment with Respect to Counts I and II of the Complaint* (the "**Gordon Decl.**") and *Declaration of D.J. Monagle in Support of the Debtors' Motions for (A) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors, and (B) Summary Judgment with Respect to Counts I and II of the Complaint* (the "**Monagle Decl.**").  The Debtors believe that the issues forming the basis for the relief set forth herein are both imperative to progressing their reorganization efforts and may be decided by the Court as a matter of law without the need for protracted litigation.

a final order by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue for this matter is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### BASIS FOR RELIEF

10.     The statutory bases for the relief requested herein are sections 362(a) and 105(a) of the Bankruptcy Code and section 2201(a) of title 28 of the United States Code.

11.     The Debtors have commenced this Adversary Proceeding pursuant to Bankruptcy Rules 7001(7), 7001(9), and 7065.

### THE PARTIES

12.     BMI is a company organized under the laws of the state of Delaware.  Until the court-approved sale of substantially all of BMI's talc-related assets, BMI had been involved in the mining, beneficiating, processing, and sale of talc since 1992.  Debtor Barretts Ventures Texas LLC is a wholly-owned subsidiary of BMI that directly or indirectly owns and manages certain real property.

13.     Each named defendant listed as a plaintiff in Appendix A to this Complaint is a current plaintiff in a Testing Action against the BMI Affiliates and asserts a Testing Claim against the BMI Affiliates in the Testing Action seeking either damages or both damages and injunctive relief.

14.     Each of defendants Jane and John Does 1-1,000 is a prospective plaintiff who may, at any time during the pendency of these Chapter 11 Cases, commence or seek to commence an action to pursue a Testing Claim against the BMI Affiliates.

**FACTUAL BACKGROUND**

I.      **The Debtors' Corporate Structure, Operations, and History**

      A.      **The Debtors and the BMI Affiliates**

15.      Until the court-approved sale of substantially all of BMI's talc-related assets, BMI was primarily in the business of mining, beneficiating, and processing talc from southwest Montana.  BMI is a wholly-owned subsidiary of SMI, which is a wholly-owned subsidiary of MTI.

16.      BMI's talc operations included two mines owned by BMI and located in Dillon, Montana (the Regal-Imperial Mine and the Treasure Mine), a processing facility located in Dillon, Montana, and a blending and packaging facility located in Bay City, Texas.  The Regal-Imperial Mine was an open-pit operation, where operations consist of conventional open-pit mining methods, with drilling, blasting, loading, and hauling to staging pads or directly to the processing facility in Dillon.  With the Regal pit approaching depletion status, mining began at the Imperial pit in 2023.  The Treasure Mine was a development project, which contemplated expanding on the prior Treasure open-pit operations.  Operations at the Treasure Mine were similar to those performed at the Regal-Imperial Mine.

17.      Following mining at one of the two mines owned and operated by BMI, talc would be transported to the processing facility in Dillon, Montana, where the talc would be beneficiated, milled, and packaged, before being sold to customers or sent to a BMI-owned facility in Bay City, Texas.  The talc sent to the Bay City facility would be blended and packaged to meet certain customer specifications.  BMI mined and processed talc in Montana since BMI was formed and spun off of Pfizer in 1992, and blended and packaged talc in Texas since 1999.

18.      BMI owned the full value chain of its talc operations, from mining to milling and processing to packaging, which allowed it to produce the highest quality talc.  BMI's differentiated manufacturing capabilities provided it operational flexibility to meet demand from a diverse set of

customers across numerous end markets.  The end product of BMI's talc value chain was high-quality processed and packaged talc that was either shipped to customers and distributors, or stored.  BMI supplied talc to distributors and third-party manufacturers for use in such parties' products, which were then sold to consumers.  BMI did not manufacture any final products containing talc or sell such products directly to consumers.

19.     Since its formation in 1992, BMI has been a separate legal entity with distinct operations from MTI, SMI, and the other BMI Affiliates.  Neither MTI nor any of the BMI Affiliates ever operated any talc-related assets.  The BMI Affiliates do not and did not mine, process, beneficiate, or sell talc.  All such mining, processing, beneficiating, and packaging of talc was performed by BMI.  Indeed, at all points in the process, BMI's talc operations and related decision-making were conducted or directed by BMI.

**B.     Testing of Talc Mined, Beneficiated, or Distributed by BMI**

20.     BMI implemented robust operating and testing procedures designed to test its talc for potential asbestos contamination.  While BMI performed some of its testing of talc on location, more advanced testing, including testing using x-ray diffraction ("**XRD**"), selected area electron diffraction ("**SAED**"), polarized light microscopy ("**PLM**") and transmission electronic microscopy ("**TEM**"), was performed off-site at BMI's direction.

21.     From 1992 through 2024, Analytical Services Group ("**ASG**"), a division of SMI, performed or oversaw the testing on BMI talc pursuant to a shared services arrangement between BMI, SMI, and MTI.[6]  The testing arrangement was performed according to the parties' shared

---

[6]     The shared services arrangement between BMI, SMI, and MTI was memorialized in the Services Agreement among MTI, SMI, and BMI, dated as of June 19, 2023, and effective as of January 1, 2023 (the "**Initial Shared Services Agreement**").  The Initial Shared Services Agreement was amended on September 28, 2023 (the "**Shared Services Amendment**" and, together with the Initial Shared Services Agreement, the "**BMI Shared Services Agreement**").  Although the shared services arrangement was memorialized in 2023, the BMI Shared Services Agreement formalized the pre-existing shared services relationship between BMI and the BMI Affiliates.

services arrangement, which was later formalized through the BMI Shared Services Agreement. Pursuant to the BMI Shared Services Agreement, the BMI Affiliates were to "provide testing services through an independent business unit, [ASG], which conducts minerals testing within MTI's corporate structure."  BMI Shared Services Agreement, Schedule A.  Although the BMI Shared Services Agreement memorialized the shared services arrangement, ASG had performed testing for BMI in a manner largely consistent with the BMI Shared Services Agreement since 1992.

22.     From 1992 to about 2007, ASG performed all testing methodologies to test BMI talc for the absence of asbestos at its Pennsylvania testing facilities.  Beginning in or around 2008, BMI outsourced certain of the testing methodologies (*e.g.*, PLM and TEM) to the RJ Lee Group ("**RJ Lee**"), while ASG continued to perform XRD testing on BMI's talc.  Then, beginning in 2016 and continuing through 2024, BMI further supplemented the outsourced PLM and TEM testing to AMA Analytical Services, Inc. ("**AMA**").  Whether the testing was performed by BMI, ASG, RJ Lee, or AMA, the testing performed or outsourced was done at the direction of BMI.

C.     **Sale of BMI's Talc Assets and Continuing Real Estate Business**

23.     Prior to the Petition Date, BMI determined to cease its talc-generating activities as part of an effort to resolve its talc liabilities fully, finally, and equitably.  As a result, BMI initiated a robust prepetition marketing process for its talc-related assets and operations.  Following approval by the Bankruptcy Court, on April 29, 2024, the Debtors closed the sale (the "**Sale**") of their talc-related assets.  The Sale generated $32 million in cash (plus assumed liabilities).

II.     **Historical and Continued Talc Litigation against BMI and Certain BMI Affiliates**

A.     **Talc Claims and Historical Settlement of Talc Claims**

24.     BMI faces significant disputed and contingent liabilities as a result of hundreds of Talc Claims brought against it and certain BMI Affiliates.  As of the Petition Date, BMI and certain

BMI Affiliates had been sued in over 880 cases asserting Talc Claims.  Prior to 2018, BMI had been sued in only 14 lawsuits alleging Talc Claims.  In 2018 and 2019, plaintiffs began filing Talc Claims at an increasing pace, rising to 18 in 2018 and 48 in 2019.  The number of claims increased to 93 in 2020, 169 in 2021, and 205 in 2022.  As of the Petition Date, there were approximately 555 pending Talc Claims.  The number of pending Talc Claims has further expanded since the Petition Date, with the overwhelming majority of those newly-filed claims being asserted against the BMI Affiliates.  As of the filing of this Complaint, there are approximately 697 pending Talc Claims.  No cases alleging Talc Claims against BMI have gone to trial, and there has never been a judicial finding that BMI's talc actually contained asbestos.

### B.      Testing Claims and the Testing Actions

25.      The Testing Actions are pending cases that allege or that attempt to allege Testing Claims, *i.e.*, those pending actions in which one or more of the BMI Affiliates has been named as a defendant where claimants are seeking recovery from such BMI Affiliate in connection with the alleged inadequacy of testing of talc mined, beneficiated, and/or sold by BMI.[7]  The Testing Actions can be generally grouped into three categories:

    a)  First, there are Testing Actions in which the Testing Claimants allege broad negligence or product liability claims against numerous defendants, and in connection with those claims, allege generally that those defendants (including one or more BMI Affiliates, numerous other defendants, and sometimes BMI) negligently manufactured, distributed, mined, packaged, sold, and/or tested asbestos-containing talc, and suffered personal injuries as a result of their exposure to asbestos-containing talc.  As of the filing of this Complaint, there are 309 Testing Actions containing such generalized allegations.

    b)  Second, there are Testing Actions in which the Testing Claimants include specific allegations focused on the BMI Affiliates' allegedly inadequate testing of talc mined, sold, and/or beneficiated by BMI.  As of the filing of this Complaint, there

---

[7]     For the avoidance of doubt, the identification of a pending claim as a Testing Action is not an admission that the Testing Action asserts *only* a Testing Claim against MTI or SMI such that it would not be stayed under the PI Order.

10

are 103 Testing Actions that include specific testing-related allegations targeting one or more BMI Affiliates.

c) Third, there are Testing Actions in which the claimants allege a standalone negligent testing claim against one or more of the BMI Affiliates.[8]  In such Testing Actions, claimants generally allege that the BMI Affiliates negligently tested talc that was mined, beneficiated, and/or sold by BMI by either (i) failing to test the talc entirely, or (ii) inadequately testing BMI's talc to determine the presence of asbestos.  As a result of the BMI Affiliates' allegedly inadequate testing, the claimants in the Testing Actions allege that they were then exposed to talc containing asbestos that was mined, beneficiated, and/or sold by BMI, and this exposure caused the claimants' injuries.  As of the filing of this Complaint, there are currently 44 Testing Actions asserting such a claim against one or more BMI Affiliates.

**C.    Continued Prosecution of the Testing Claims Would Immediately and Adversely Affect the Debtors' Estates.**

26.    Absent a stay of Testing Claims against the BMI Affiliates during the Chapter 11 Cases, the Debtors' estates would suffer immediate adverse consequences.  The Testing Claims are premised on the BMI Affiliates' testing of BMI's talc.  In order to prevail on a Testing Claim, Testing Claimants would have to prove that talc sold by BMI was, in fact, contaminated with asbestos.  To date, no such judicial determination has ever been made, and if a Testing Claim were to proceed against the BMI Affiliates, then the Debtors would be compelled to participate in order to protect their (and the estates') interests.  Indeed, the Debtors believe there is a risk of collateral estoppel or *res judicata* should Testing Actions proceed against the BMI Affiliates.

27.    Even beyond the preclusive doctrines of collateral estoppel and res judicata, the Debtors would nevertheless be compelled to participate in any material aspect of the litigation of such claims to protect their and the estates' interests.  The risk of any judicial determination that talc sold by BMI contained asbestos, given that no such determination has been made to date, would have too great an effect on the Debtors' estates and these Chapter 11 Cases for the Debtors

---

[8]    The Debtors have identified the Testing Actions asserting each category of Testing Claims in Appendix A.

to stand idly by.  Indeed, whether BMI's talc contained asbestos is a central issue in these Chapter 11 Cases.  If such a finding were made in connection with litigation of a Testing Claim, it would have immediate, significant, and far-reaching consequences.

28.     The Debtors' compelled participation presents an immediate risk, given that certain Testing Actions have looming motion return dates, filing deadlines, discovery obligations, and critical hearings.  Any determination about what is and is not property of BMI's estate is exclusively within the purview of this Court, and injunctive relief is necessary to protect the estates and preserve this Court's ability to make determinations critical to the Chapter 11 Cases.

29.     Even beyond the need for the Debtors to participate in the litigation and defense of Testing Claims, the monitoring of fragmented litigation throughout the United States will put a strain on and divert key resources from the Debtors' reorganization efforts.  Many of the currently-pending Testing Actions not only assert Testing Claims, but also product liability or negligence claims arising out of the mining, beneficiating, or sale of BMI's talc.  Due to the unavoidable overlap between Testing Claims and those claims asserted against BMI, in order to adequately protect and preserve BMI's rights, the Debtors must actively monitor such cases.  The Debtors will continue to be forced to actively monitor Testing Actions to ensure that there are no rulings in Testing Actions that purport to adjudicate the alleged asbestos contamination of talc sold by BMI.

## III.     THE NEED FOR A DETERMINATION OF OWNERSHIP OF TESTING CLAIMS

30.     The Debtors' decision to commence the Chapter 11 Cases was prompted by an overwhelming number of Talc Claims, relative to BMI's size, coupled with: (i) an increase in settlement demands with respect to Talc Claims; (ii) the unavailability of insurance coverage due to allegations of asbestos contamination; and (iii) developing trends in talc litigation.

31.     The primary purpose of the Chapter 11 Cases was and still remains to address and comprehensively resolve BMI's liabilities arising out of the production and distribution of talc. The Debtors' ultimate goal remains to negotiate—and ultimately confirm—a consensual plan of reorganization that creates a section 524(g) trust vested with substantial assets for the benefit of current and future Talc Claimants and provides for a channeling injunction prohibiting claimants from asserting claims arising from talc mined, produced, or sold by BMI against the Debtors or any BMI Affiliates.  Nevertheless, the Debtors are also prepared to go forward, if necessary, with a non-section 524(g) alternative that will provide for the settlement of estate causes of action and the discharge of the Debtors' liabilities.

32.     Since January 2024, the Debtors, MTI, the Committee, and the FCR have been engaged in mediation regarding a potential resolution of the Debtors' talc liabilities (the "**Mediation**") with mediator Kenneth R. Feinberg (the "**Mediator**").  The Mediation has been consensually extended six times by the parties [Docket Nos. 952, 982, 1037, 1075, 1149 & 1206], during the course of which the Debtors paused their pursuit of various litigation issues before the Court, including the issues raised in this Adversary Proceeding.  Unfortunately, the Mediation has not yielded a consensual resolution despite over a year of good faith participation by the Debtors and the BMI Affiliates.

33.     The Debtors' goal in these Chapter 11 Cases has always been to achieve a consensual resolution of their talc-related liabilities with the Committee, FCR, and other key stakeholders.  Although the Debtors remain committed to that goal, the Debtors are prepared to move these cases forward using other available tools.  The Debtors bring this Adversary Proceeding as one aspect of an overall strategy to progress the Chapter 11 Cases and address their talc-related liabilities.  Specifically, this Adversary Proceeding puts before the Court an issue

critical to obtaining the funding of a plan that provides for creditor recoveries:  whether Testing Claims are property of BMI's estate.  Indeed, whether Testing Claims are property of BMI's estate will necessarily impact the terms of any settlement that may be reached with the BMI Affiliates and the Debtors, regardless of whether the Debtors pursue a section 524(g) plan or a non-section 524(g) plan.

## NATURE OF THE RELIEF REQUESTED

34.     To ensure a key estate asset is preserved for the benefit of all creditors in these Chapter 11 Cases (including future claimants), the Debtors seek an order: (i) declaring that Testing Claims asserted against the BMI Affiliates are property of BMI's estate, (ii) declaring the automatic stay under section 362 of the Bankruptcy Code prohibits the continued prosecution or the filing of Testing Claims against the BMI Affiliates, and (iii) enjoining the continued prosecution or the filing of any additional Testing Claims pursuant to section 105 of the Bankruptcy Code during the pendency of these Chapter 11 Cases.

## COUNT I
## DECLARATORY RELIEF PURSUANT TO
## SECTION 541 OF THE BANKRUPTCY CODE
## (Against All Defendants)

35.     The Debtors incorporate by reference all preceding paragraphs as if fully set forth herein.

36.     Section 541 of the Bankruptcy Code provides that the filing of a chapter 11 petition "creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a).

37.     Fifth Circuit precedent recognizes that claims belong to the bankruptcy estate if, under applicable law, the debtor could have raised the claim as of the commencement of the bankruptcy case.  *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas*

14

*Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008).  As part of this inquiry, courts in the Fifth Circuit look to the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury.  *Id.*  If the harm to the creditor comes about only because of harm to the debtor, then the injury is derivative, and the claim is property of the estate.  *Meridian Capital CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019).

38.     Here, Testing Claims are property of BMI's estate.  BMI could have raised Testing Claims at the commencement of these Chapter 11 Cases.  Furthermore, the injury for which claimants seek relief in asserting Testing Claims is derivative of and entirely dependent on an injury to BMI.  The Testing Claims seek relief for injuries allegedly caused by exposure to asbestos-containing talc mined, beneficiated, or sold by BMI, and assert that BMI's talc was contaminated with asbestos on account of the alleged inadequacy of testing performed by the BMI Affiliates.  Thus, any injury to Testing Claimants comes about only because of, and flows directly from, the alleged harm to BMI from the BMI Affiliates' inadequate testing of BMI's talc.  Put differently, Testing Claimants would have been harmed by the BMI Affiliate's actions only if BMI were also harmed by those same actions of the BMI Affiliates, and the damages BMI could seek against the BMI Affiliates would encompass the damages sought by the Talc Claimants against the BMI Affiliates (both being on account of the Talc Claimants' alleged personal injuries).

39.     Accordingly, and in line with Fifth Circuit precedent, the Testing Claims, including the Testing Actions, are property of BMI's estate.

### COUNT II
### DECLARATORY RELIEF PURSUANT TO
### SECTION 362(a)(3) OF THE BANKRUPTCY CODE
### (Against All Defendants)

40.     The Debtors incorporate by reference all preceding paragraphs as if fully set forth herein.

41. Section 362(a)(3) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

42. Section 541 of the Bankruptcy Code provides that the filing of a chapter 11 petition "creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

43. Testing Claims are property of BMI's estate. Accordingly, and in line with Fifth Circuit precedent, Testing Claims, including the Testing Actions, are automatically stayed under section 362(a)(3) of the Bankruptcy Code because any attempt by Defendants to commence, continue to prosecute, or settle such claims against MTI or SMI while these Chapter 11 Cases are pending constitutes an act to control property of the BMI's estate.

<u>COUNT III</u>
<u>INJUNCTIVE RELIEF PURSUANT TO SECTIONS 105(a)</u>
<u>AND 362 OF THE BANKRUPTCY CODE</u>
<u>(Against All Defendants)</u>

44. The Debtors incorporate by reference all preceding paragraphs as if fully set forth herein.

45. Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estates, and aid in the formulation and confirmation of a chapter 11 plan that maximizes recovery to all of the Debtors' creditors.

46. Section 362(a)(1) of the Bankruptcy Code operates as a stay, "applicable to all entities," against "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the

16

commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

47.     Relief under section 105(a) of the Bankruptcy Code is proper where, as here, the relief is necessary to protect the Debtors' ability to effectively reorganize and to preserve property of the Debtors' estates.  Specifically, to the extent Testing Claims are not subject to the automatic stay pursuant to section 362(a)(3) of the Bankruptcy Code, Testing Claims against the BMI Affiliates should be stayed as essential to the Debtors' reorganization efforts.  Indeed, the filing and continued prosecution of Testing Claims against the BMI Affiliates will frustrate and jeopardize the Debtors' efforts to successfully reorganize.  The Debtors and the BMI Affiliates share an identity of interest sufficient to extend the automatic stay because the Testing Claims asserted against MTI and SMI are premised on the allegedly harmful product or conduct of BMI, such that those claims—even if nominally pursued against one or more BMI Affiliates—constitute claims against the Debtors within the meaning of section 362(a) of the Bankruptcy Code.

48.     Extension of the stay is further warranted because the prosecution of Testing Claims against the BMI Affiliates during the pendency of these Chapter 11 Cases, would immediately and adversely impact the Debtors' estates and reorganization efforts by requiring BMI to participate in the defense of the Testing Claims to avoid adverse, preclusive rulings and record taint.  BMI's compelled participation presents an immediate risk, given that certain Testing Actions have looming motion and discovery deadlines, including deadlines in connection with (i) a pending motion to dismiss that could decide an issue that is potentially relevant to the analysis of whether the Testing Claims are property of BMI's estate and (ii) outstanding discovery against the BMI Affiliates that seeks information largely focusing on BMI.

17

49.     An order enjoining the Testing Claims is warranted here because the four requirements for injunctive relief are met.

50.     First, the Debtors have a substantial likelihood of succeeding on the merits in this action because unusual circumstances exist justifying the enjoining of the Testing Claims as against the BMI Affiliates.  These unusual circumstances include the shared identity of interest between the BMI Affiliates and the Debtors.  The Debtors and BMI Affiliates share an identity of interest because the Testing Claims are (or will be) ultimately based on the conduct of BMI, such that those claims—even if ostensibly pursued against the BMI Affiliates—would essentially constitute claims against the Debtors within the meaning of section 362(a) of the Bankruptcy Code. Unusual circumstances here also include the adverse impact the continuation of the Testing Claims against the BMI Affiliates would have on the Debtors' estates and reorganization.  BMI would be compelled to expend finite estate resources to participate in defending the allegations of the Testing Claims to avoid adverse, preclusive rulings and record taint.

51.     Second, if the Testing Claims are not enjoined, then the Debtors will suffer imminent and irreparable harm and their reorganization efforts will be threatened.  This threat includes (i) the risk that the central issue of these Chapter 11 Cases, whether talc mined, beneficiated, or sold by BMI contained asbestos, would be adjudicated outside of this Court, which would immediately and adversely affect the estates; (ii) the risk of collateral estoppel, res judicata, and record taint prejudicing BMI such that BMI would be forced to participate in the Testing Claims; and (iii) a drain on the Debtors' resources due to monitoring fragmented litigation throughout the United States.

52.     Third, the likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm to the Defendants.  The Defendants will suffer little or no harm if

18

the Testing Claims are enjoined because an injunction would merely pause the litigation of Testing Claims pending further determination by this Court and would not deprive the Defendants of an opportunity to pursue their claims, in the event they are determined to have any.  In contrast, such an injunction will advance the interests of estate claimants in being equitably and ratably compensated by the Debtors focusing their efforts on pursuing confirmation of a plan that fully and fairly resolves current and future claimants claims equitably and settles or resolves estate claims.   Moreover, an injunction will ensure that whether the Testing Claims are estate property is decided by this Court and in these Chapter 11 Cases, as it should be.

53.      Finally, the injunctive relief sought herein serves the public interest for two reasons. First, it would further the Congressional purpose behind the automatic stay of providing the Debtors with "a breathing spell."  Second, injunctive relief would support the Debtors' efforts to reorganize, which furthers the Congressional purposes behind the Bankruptcy Code (including section 524(g)), *i.e.*, to provide a "fresh start" to companies beset with asbestos-related claims and to provide a just and equitable recovery for all holders of such claims.  Accordingly, the injunctive relief the Debtors seek in this Complaint is appropriate and serves the public interest by promoting the orderly and effective administration of the Debtors' estates.

## **PRAYER**

**WHEREFORE**, for the foregoing reasons, the Debtors respectfully request entry of judgment (i) declaring that Testing Claims asserted against the BMI Affiliates are property of BMI's estate, (ii) declaring the automatic stay under section 362 of the Bankruptcy Code applies to prohibit the continued prosecution or the filing of Testing Claims against the BMI Affiliates, and (iii) enjoining continued prosecution of or the filing of any additional Testing Claims pursuant to section 105 of the Bankruptcy Code during the pendency of these Chapter 11 Cases.

Dated: March 24, 2025                Respectfully Submitted,
      Houston, Texas

*/s/John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Eric D. Wade (TX Bar No. 00794802)
Heather K. Hatfield (TX Bar No. 24050730)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone: (713) 226-6000
Email: jhiggins@porterhedges.com
      ewade@porterhedges.com
      hhatfield@porterhedges.com
      myoung-john@porterhedges.com
      jkeefe@porterhedges.com

-and-

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
Christina Craige (admitted *pro hac vice*)
Shawn P. Hansen (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
      kim.posin@lw.com
      amy.quartarolo@lw.com
      chris.craige@lw.com
      shawn.hansen@lw.com

*Counsel to the Debtors and Debtors in Possession*